UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| DENNIS DUMAS,<br><br>Plaintiff,<br><br>-against-<br><br>KROLL, LLC,<br><br>Defendant. | : | **No. 23 Civ. 5013 (MMG)** |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

PECHMAN LAW GROUP PLLC
488 Madison Avenue, 17th Floor
New York, New York 10022

## TABLE OF CONTENTS

**PRELIMINARY STATEMENT** .......... **1**

**STATEMENT OF FACTS** .......... **2**

A. Dumas's Background and Recruitment by Kroll .......... 2

B. Kroll's Initial Satisfaction with Dumas's Performance .......... 3

C. Dumas's Heart Surgery, Stroke, and Medical Leave .......... 3

D. Dumas's Return to Work and Remote Work Accommodation .......... 4

E. Kroll Attempts to Assign Dumas to On-Site Work in Violation of his Medical Accommodation .......... 6

F. Kroll Issues Dumas a PIP Immediately Following Its Failed Attempt to Assign On-Site Work in Violation of His Medical Accommodation .......... 8

G. Kroll Terminates Dumas's Employment Immediately Following the PIP Issuance .......... 9

**LEGAL STANDARDS** .......... **11**

A. Summary Judgment Standard .......... 11

B. NYSHRL and NYCHRL Standards .......... 12

**ARGUMENT** .......... **13**

A. The Substantial Record Evidence of Discriminatory and Retaliatory Animus .... 14

1. Kroll's Actions to Terminate Dumas's Employment Begin Immediately After Its Attempts to Assign Dumas to On-Site Work in Violation of his Medical Accommodation .......... 15

2. Kroll's Failure to Engage in Cooperative Dialogue in Response to Dumas's Alternative Accommodation Request .......... 18

3. Kroll Terminates Dumas's Employment Seventeen Business Day After Issuing the PIP .......... 21

B. Kroll's Purported Justifications Do Not Warrant Summary Judgment .......... 23

**CONCLUSION** .......... **27**

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Dearden v. Glaxosmithkline LLC,* No. 15 Civ. 7628,
2017 U.S. Dist. LEXIS 149408 (S.D.N.Y. Sep. 14, 2017) .......... 13

*Desiderio v. Hudson Techs., Inc.,* No. 22 Civ. 541,
2025 U.S. Dist. LEXIS 84285 (S.D.N.Y. May 2, 2025) .......... 12

*Fasanello v. UN Int'l Sch.*, No. 19 Civ. 5281 (GHW),
2022 U.S. Dist. LEXIS 52536 (S.D.N.Y. Mar. 23, 2022) .......... *Passim*

*Gallo v. Prudential Res. Servs., Ltd. P'ship.,*
22 F.3d 1219 (2d Cir. 1994) .......... 11, 12

*Gerard v. 1199 Nat'l Ben. Funds,* No. 23 Civ. 7950 (DEH),
2024 U.S. Dist. LEXIS 166600 (S.D.N.Y. Sep. 13, 2024) .......... 12

*Gioia v. Forbes Media LLC,*
501 F. App'x 52 (2d Cir. 2012) .......... 13

*Goldman v. Sol Goldman Invs. LLC,* No. 20 Civ. 6727 (MKV) (SN),
2022 U.S. Dist. LEXIS 140927 (S.D.N.Y. Aug. 5, 2022) .......... 20

*Hamburg v. N.Y. Univ. Sch. of Med.,*
62 N.Y.S.3d 26 (1st Dep't 2017) .......... 13, 14

*Heiden v. N.Y.C. Health & Hosps. Corp.,* No. 20 Civ. 10288 (LJL),
2023 U.S. Dist. LEXIS 5583 (S.D.N.Y. Jan. 11, 2023) .......... *Passim*

*Jacobsen v. N.Y.C. Health & Hosps. Corp.,*
22 N.Y.3d 824 (2014) .......... 20

*Jeffreys v. City of New York,*
426 F.3d 549 (2d Cir. 2005) .......... 12

*Jones-Cruz v. Brookdale Hosp. Med. Ctr.,* No. 19 Civ. 6910 (MMG),
2025 U.S. Dist. LEXIS 108024 (S.D.N.Y. June 6, 2025) .......... 13

*Livingston v. City of New York,*
563 F. Supp. 3d 201 (S.D.N.Y. Sep. 28, 2021) .......... 12

*Macropoulos v. Metro. Life Ins. Co.,* No. 15 Civ. 6096 (ER)
2018 U.S. Dist. LEXIS 49626 (S.D.N.Y. Mar. 26, 2018) .......... 24

*Melman v. Montefiore Med. Ctr.,*
946 N.Y.S.2d 27 (1st Dep't 2012) .......... 13, 14

*Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*,
715 F.3d 102 (2d Cir. 2013) .......... 13, 14

*Nofal v. IMCMV Times Square LLC*, No. 22 Civ. 3104 (DEH),
2024 U.S. Dist. LEXIS 47603 (S.D.N.Y. Mar. 15, 2024) .......... 12

*Pacheco v. Park S. Hotel, LLC*, No. 12 Civ. 9127,
2014 U.S. Dist. LEXIS 9690 (S.D.N.Y. Jan. 27, 2014) .......... 14, 17

*Ruiz v. Credit Agricole Corp. & Inv. Bank*, No. 22 Civ. 10777 (VSB) (BCM),
2025 U.S. Dist. LEXIS 109626 (S.D.N.Y. June 10, 2025) .......... 17

*Specht v. City of New York*,
15 F.4th 594 (2d Cir. 2021) .......... 17

*Stuart v. T-Mobile USA, Inc.*, No. 14 Civ. 4252,
2015 U.S. Dist. LEXIS 106155 (S.D.N.Y. Aug. 12, 2015) .......... 20

*Syeed v. Bloomberg L.P.*,
568 F. Supp. 3d 314 (S.D.N.Y. Oct. 25, 2021) .......... 12

*Turner v. NYU Hosps. Ctr.*,
784 F. Supp. 2d 266 (S.D.N.Y. Mar. 4, 2011) .......... 12

*Wellner v. Montefiore Med. Ctr.*,
U.S. Dist. LEXIS 147844, at *34 (S.D.N.Y. Aug. 29, 2019) .......... 19

*Williams v. N.Y.C. Hous. Auth.*,
872 N.Y.S.2d 27 (1st Dep't 2009) .......... 13

*Ya-Chen Chen v. City Univ. of N.Y.*,
805 F.3d 59 (2d Cir. 2015) .......... 13

## PRELIMINARY STATEMENT

To prevail on its motion for summary judgment, Defendant Kroll, LLC must demonstrate on the record facts that discriminatory and retaliatory animus played no role in its decision to terminate Plaintiff Dennis Dumas's employment following his open-heart surgery, stroke, and remote work accommodation. Defendant's motion ignores both this standard and the record evidence of its animus.

It is undisputed that Kroll attempted to assign Dumas to on-site work in violation of his remote work medical accommodation. It is undisputed that Kroll summarily rejected Dumas's attempts to secure an alternative accommodation to comply with Kroll's on-site work request despite his medical accommodation. It is undisputed that Kroll issued Dumas a performance improvement plan ("PIP") in the immediate aftermath of its attempt to assign him on-site work and rejection of his alternative accommodation request to perform that work. It is undisputed that Kroll decided to terminate Dumas's employment a mere seventeen business days after placing him on a PIP. It is undisputed that Dumas's direct supervisor did not make any attempt to meet with Dumas to discuss his progress against the purported PIP deficiencies before firing him, despite his own assurances and instruction by Human Resources to hold meetings.

Viewed in the light most favorable to Dumas, the record evidence is more than sufficient to establish a jury question whether discrimination and retaliation were motivating factors in Kroll's termination of his employment. Because Kroll cannot demonstrate that discriminatory and retaliatory animus played no role in that decision, its motion for summary judgment should be denied. Further, because Kroll committed a "per se" violation of the NYCHRL by failing to engage in cooperative dialogue about Dumas's alternative accommodation request to perform Kroll's on-site work assignment, summary judgment on Dumas's NYCHRL discrimination claim is precluded.

## STATEMENT OF FACTS

### A. Dumas's Background and Recruitment by Kroll

Dennis Dumas is a seasoned securities attorney and financial industry executive. He holds a Bachelor of Science degree in Physics from Duke University and a Juris Doctor degree from Duke University School of Law. PSOF ¶ 155.[1] Prior to his employment with Kroll, Dumas held positions as, *inter alia*, an Attorney-Advisor for the United States Securities and Exchange Commission ("SEC"), Special Assistant U.S. Attorney, Senior Associate at Pillsbury Winthrop, Managing Counsel for The Bank of New York Mellon, and President, General Counsel, and Chief Compliance Officer of Avanza Capital Markets, Inc. PSOF ¶ 156. Dumas has previously held FINRA general securities, principal, operations, and compliance licenses. PSOF ¶ 157. Dumas has served as an expert witness on ten matters throughout his career and has continued to serve as an expert witness following his termination by Kroll. PSOF ¶¶ 158-159.

Kroll Managing Director Anna Povinelli obtained a copy of Dumas's resume and recruited Dumas for a Director role in Kroll's Financial Services and Compliance Regulation ("FSCR") group because of his credentials. JSOF ¶¶ 20-21. Povinelli held an initial conversation with Dumas and forwarded his resume to Ken Joseph (Kroll's U.S. Head of Regulatory Consulting) and former Managing Director Peter Wilson. PSOF ¶ 161. Povinelli encouraged Dumas's hiring, noting in her correspondence that Dumas "would make a great addition to our team" and had an "extensive" compliance background and "the appreciation and knowledge of regulations" that Kroll was looking for. *Id.*; JSOF ¶ 21. Povinelli, Joseph, and Wilson interviewed Dumas for the role. JSOF

[1] "PSOF" refers to Plaintiff's Rule 56.1 Statement of Facts (ECF No. 57). "JSOF" refers to the parties' Joint Statement of Undisputed Facts (ECF No. 43-1). "DSOF" refers to Defendant's Rule 56.1 Statement of Facts (ECF No. 43) and Plaintiff's Responses thereto (ECF No. 56).

¶ 23. There was no indication of revenue targets in the Director job description, nor were revenue targets discussed during the interview. JSOF ¶ 28; PSOF ¶ 162. Kroll hired Dumas as an FSCR Director effective September 13, 2021. JSOF ¶ 25.

**B. Kroll's Initial Satisfaction with Dumas's Performance**

Joseph was assigned as Dumas's career advisor and direct supervisor. JSOF ¶ 33. Initially, Joseph assigned work to Dumas, with a particular emphasis on expert reports. Between September and November 2021, Joseph assigned Dumas to work on expert reports for Kroll clients Brevet and BXP. JSOF ¶ 36; PSOF ¶ 163. Joseph's written communications reflect no criticisms of Dumas's work on these projects. PSOF ¶ 164-65. They instead reflect that Joseph trusted Dumas with work product. For example, in a November 2, 2021 email to Dumas regarding a draft of the Brevet report, Joseph noted to Dumas that he had made "minor changes," and instructed Dumas: "If you agree, please finalize, change the document name, and transmit [to the client]." PSOF ¶ 164.

Kroll's satisfaction with Dumas's performance prior to his disability and remote work accommodation is further demonstrated by Dumas's 2021 performance rating. Joseph rated Dumas as "Fully Meets Goals" under the Performance Rating Model, and as "Proficient" under the Proficiency Rating Model for 2021. JSOF ¶ 50. These ratings reflected that Dumas's "[r]esults achieved fully met standards/expectations," and that Dumas had shown a "consistent demonstration of many competencies required at the current skill level." PSOF ¶ 166. Dumas's 2021 rating was higher than Povinelli's, who was rated as "Developing" on her 2021 Proficiency Rating Model. PSOF ¶ 167.

**C. Dumas's Heart Surgery, Stroke, and Medical Leave**

On November 12, 2021, Dumas underwent a prescheduled cardiac surgery. The surgeon pierced Dumas's heart, requiring him to undergo an open-heart surgery. Dumas suffered a stroke one week later. JSOF ¶¶ 37-38. The stroke left Dumas physically

impaired and particularly impacted his strength and ability to walk. PSOF ¶ 168. His recovery took several months of in- and out-patient rehabilitation. PSOF ¶ 169. Doctors were skeptical that Dumas would recover the ability to walk on his own, but Dumas was determined to walk again and recovered his ability to do so using a walking stick. PSOF ¶ 170.

As a result of these medical events, Kroll placed Dumas a five-month *unpaid* leave of absence, from November 11, 2021 to April 18, 2022. JSOF ¶ 39. In fact, after Dumas's return to work following his unpaid leave, Kroll required Dumas to repay $15,070.44 issued to him because of a Kroll payroll error during his leave, which was deducted from Dumas's paychecks after his return. JSOF ¶ 43.

Despite being on unpaid leave, Dumas was responsive to correspondence from Kroll supervisors during his leave and recovery. For example, Dumas forwarded Joseph a copy of a draft expert report on December 2, 2021 at Joseph's request. JSOF ¶ 44. Dumas also took initiative to bring in new work for Kroll while on unpaid leave, including by providing a referral for an expert engagement that Kroll subsequently retained. PSOF ¶ 171. During his unpaid leave, Dumas had a telephone conversation with Povinelli, during which she expressed "frustration and irritation" that Plaintiff was "unavailable to assist her" during his leave period. JSOF ¶ 47. Joseph testified that Dumas's medical leave impacted Kroll's ability to serve its clients and properly staff its engagements without creating an "overburden" on other directors. PSOF ¶ 172.

**D. Dumas's Return to Work and Remote Work Accommodation**

Dumas returned to work from unpaid leave on April 18, 2022 and began to work in the office three days per week per Kroll policy. DSOF ¶ 28. Despite Joseph's prior positive feedback on Dumas's work on expert matters and concern about overburden on other Directors during Dumas's medical leave, Joseph did not assign Dumas projects on

his initial return from leave and "had no direct work with him" then. PSOF ¶ 173. Instead, Dumas's work assignments primarily came from Povinelli after his return from leave. PSOF ¶ 174; DSOF ¶ 107. Dumas alerted Povinelli to his concerns about the availability of billable hours on projects she assigned. PSOF ¶ 180. On July 5, 2022, Joseph instructed Povinelli that she needed "to assign [Dumas] some ongoing clients to ensure that he has a fair share of the workload." DSOF ¶ 19.

On July 19, 2022, Dumas suffered a fall at the elevator bank in Kroll's office, struck his head, and was transported to the hospital, where he remained for two days for treatment. JSOF ¶ 56. As a result of this fall, Dumas's doctor, Andreas Neophytides, made a medical recommendation that Dumas be granted a remote work accommodation. JSOF ¶ 61. Dumas was approved for a remote work accommodation from approximately July 20, 2022 until the termination of his employment. JSOF ¶ 62.

Antagonism from Povinelli, who had already expressed irritation around Dumas's medical leave, JSOF ¶¶ 47-48, increased in the immediate aftermath of the approval of Dumas's remote work accommodation. For example, on August 3, 2022, just two weeks after Dumas's fall and hospitalization, Povinelli sent Dumas an email raising a criticism on work material and stated: "**I realize you have had some health issues, but you have also had a lot of time on your hands** and have not contributed to the team to the extent we need you to contribute." PSOF ¶ 185 (emphasis added). Dumas replied that the work Povinelli criticized was drafted by a subordinate, not Dumas, and that he had previously informed Povinelli that he had not yet reviewed the draft because he was assigned to work on time-sensitive materials for another matter. PSOF ¶ 186.

One week later, on August 8, 2022, Joseph provided "mid-year" feedback to Dumas, who had returned to work from unpaid medical leave just four months earlier. JSOF ¶ 71-72. As of the mid-year review, Joseph recalled only the pre-disability Brevet

and BXP matters as assignments on which Joseph made personal observations about Dumas's work. PSOF ¶ 187. Following the review, which included criticism of Dumas's "utilization" and "client engagement numbers," JSOF ¶ 72, Dumas informed Joseph on a follow-up call that his utilization numbers had suffered because of instructions by Povinelli to reclassify several of his billed hours as administrative. PSOF ¶ 188. Dumas also informed Joseph about his previous stroke and reminded Joseph about his remote work accommodation. *Id.*; JSOF ¶ 76.

Joseph provided a summary of this second call by email to Povinelli and Kroll HR Partner Colton Lewis. JSOF ¶ 78. Lewis reiterated in response that Dumas's remote work accommodation should remain in place in light of his situation and doctor's recommendations. PSOF ¶ 190. Povinelli, on the other hand, responded to Joseph's email: "I suggest we place [Dumas] on a PIP." JSOF ¶ 79.

### E. Kroll Attempts to Assign Dumas to On-Site Work in Violation of his Medical Accommodation

Despite Lewis's confirmation of Dumas's remote work accommodation, on September 7 and 9, 2022, Povinelli emailed Joseph about assigning Dumas to a secondment with Kroll client Assured, which would require Dumas's on-site presence. JSOF ¶¶ 82-86. With respect to the Assured secondment, Povinelli stated that she "can't think of anyone [other than Dumas] who has the capacity and knowledge to be seconded at the firm." PSOF ¶ 191. Povinelli also confirmed on September 9 that Assured "would like [Dumas] in the office occasionally (I think he should go to their office with me and Lance, at least a few times to meet everyone)." JSOF ¶ 84. She further stated that the on-site secondment "**would also be a good chance for [Dumas] to prove himself, or not.**" JSOF ¶ 85 (emphasis added). At the time she proposed assigning Dumas to the Assured secondment, Povinelli knew that the secondment required on-site presence and that

Dumas had a remote work accommodation. JSOF ¶ 86. Nevertheless, no one at Kroll advised Povinelli that she should not move forward with the plan to assign Dumas to the project requiring on-site presence due to his accommodation. JSOF ¶ 87.

On September 20, 2022, Povinelli informed Assured that Dumas would be available to work on-site three days per week. JSOF ¶ 89. Povinelli then called Dumas to inform him about the assignment. JSOF ¶ 90. Surprised about the on-site work assignment given his approved remote work medical accommodation but wanting to find a workable solution, Dumas raised his disability and medical accommodation with Povinelli and requested an alternative accommodation in the form of a car service to be on-site for Assured two days per week. JSOF ¶ 91; PSOF ¶ 192. Povinelli responded angrily and argued with Dumas about his need for a medical accommodation. PSOF ¶ 192. Povinelli challenged Dumas's need for the remote work accommodation and told him: "Dennis, everybody loses productivity at a time when they commute to work." PSOF ¶ 193.

Povinelli summarily rejected Dumas's proposal for an alternative car service accommodation, instead telling Dumas to "forget it" or "forget leading the project" with Assured. JSOF ¶ 92. Although she understood Dumas's request for a car service to perform the on-site work as an accommodation request, Povinelli did not discuss it with Lewis prior to telling Dumas to "forget" about the project. PSOF ¶ 194-95. Joseph also did not recall any discussions with Povinelli about Dumas's accommodation request. PSOF ¶ 196. Kroll never issued a written determination regarding Dumas's request for an alternative accommodation to comply with Kroll's on-site work request. PSOF ¶ 197.

The next morning, on September 21, 2022, Povinelli informed Joseph that another employee, Lance, would "take one for the team and go onsite 2 days a week" at Assured. JSOF ¶ 94. Povinelli—who had previously characterized the on-site assignment as a

chance for Dumas to "prove himself"—also stated that she would "have a call with Colton [Lewis] today to update him on Dennis, and put forth a plan." JSOF ¶ 96. Less than one week later, on September 27, 2022, Povinelli emailed Lewis a draft Performance Improvement Plan ("PIP") for Dumas, to which Lewis responded with some "tweaks." PSOF ¶ 198.

In a continued email chain about Assured, Povinelli provided Joseph with an update about the Assured kick off on September 30, 2022, and followed up with a snide remark about Dumas, whom she had seen in the office: "**PS – Dennis is the office today- in a suit. Maybe he's interviewing 😊**." JSOF ¶ 64 (emphasis added). Dumas was present at Kroll's office on September 30 at the request of Joseph's supervisor, Monique Melis. JSOF ¶ 63. Dumas had previously informed Joseph about Melis's request for an in-person meeting at the Kroll office. PSOF ¶ 199. Joseph did not inform Dumas that attending the meeting in-person was unnecessary due to his medical accommodation. PSOF ¶ 200. Nor did Joseph inform Melis that Dumas had a remote work accommodation in correspondence before the meeting, instead writing to Melis: "**Dennis has been a bust. I'm surprised that he is actually coming in, because he presented HR with a doctors [*sic*] note stating that he is too week [*sic*] to come to the office for the next year.**" PSOF ¶ 201-02 (emphasis added).

### F. Kroll Issues Dumas a PIP Immediately Following Its Failed Attempt to Assign On-Site Work in Violation of His Medical Accommodation

Povinelli emailed Lewis a draft PIP for Dumas just one week after Kroll's failed attempt to assign Dumas on-site work contrary to his medical accommodation and its rejection of his proposal for an alternative accommodation to perform the on-site work. PSOF ¶ 198. On October 10, 2022, Dumas had a follow-up heart surgery to implant a medical device. PSOF ¶ 203; DSOF ¶ 83. On October 14, 2022, Povinelli emailed Joseph,

Lewis, and Wilson stating that Dumas's "**procedure went well and he is 'back to work' today**." PSOF ¶ 204 (emphasis added; quotations in original). She also encouraged Joseph and Lewis to "sign off on the PIP and deliver." *Id*.

On October 25, 2022, Dumas attended a virtual meeting with Joseph and Lewis, in which they informed him that he was being placed on a PIP. JSOF ¶ 103. Joseph issued the PIP to Dumas, and Lewis emailed Dumas a copy during the meeting. JSOF ¶ 104. The PIP set forth five categories of "Performance Expectations" with a corresponding "Action Required" section for each. PSOF ¶ 208. The purpose of a PIP is to point out performance deficiencies and provide an employee with an opportunity to improve upon them. PSOF ¶ 205. The PIP was a confidential document and contained an instruction that it "should not be discussed with anyone other than your Human Capital Representative, Career Advisor, or [Joseph]." PSOF ¶ 206. Joseph further assured Dumas in the PIP: "**I will meet with you weekly to discuss your progress and to provide any assistance you may need as you work through this PIP.**" JSOF ¶ 105 (emphasis added).

**G. Kroll Terminates Dumas's Employment Immediately Following the PIP Issuance**

After receiving the PIP, Dumas took steps to address the alleged performance deficiencies it laid out. PSOF ¶ 209. In anticipation of the weekly meetings with Joseph, Dumas kept notes setting forth both the projects he was working on and unfair criticisms and commentary made by Povinelli following the PIP issuance. PSOF ¶ 213. However, despite his representation that weekly meetings would be held, **Joseph did not hold or schedule any meetings with Dumas to discuss his progress against the PIP before deciding to terminate his employment**. JSOF ¶ 106.

In fact, Joseph declined to meet with Dumas about PIP progress even after Lewis informed Joseph that Dumas had raised concerns about the PIP with Lewis, as the PIP instructed Dumas to do. PSOF ¶ 206, 214. Specifically, on October 27, 2022, Lewis

informed Joseph that Dumas had expressed that there were "miscommunications that led to some of the negative feedback" in the PIP and that an analyst's errors in a Lakemore deliverable had been misattributed to him. PSOF ¶ 214. Joseph asked Lewis to confirm whether "we told [Dumas] in the PIP that we would meet periodically and provide feedback." PSOF ¶ 215. Lewis confirmed that weekly meetings with Dumas should be held. PSOF ¶ 216; DSOF ¶ 88. Nevertheless, Joseph did not schedule a single meeting about the PIP with Dumas. JSOF ¶ 106.

Instead, on November 17, 2022, a mere seventeen business days after Kroll issued the PIP, Joseph decided to terminate Dumas's employment. DSOF ¶ 128. Joseph sent an email to Povinelli, Lewis, and Wilson stating: "Dennis's performance has not improved and I am ready to separate him from our practice. Any concerns?" PSOF ¶ 227. Povinelli immediately and falsely replied: "**None from me. I have not heard from him in a few days.**" PSOF ¶ 228 (emphasis added). In fact, Dumas had been in consistent communication with Povinelli about their assignments, as instructed in the PIP, including in emails on Sunday, November 13, 2022, in which Dumas provided her with a training deck for the VARA project, and on November 15, 2022, regarding updates to Court Square findings. PSOF ¶¶ 229-30.

On instruction from Lewis, Joseph waited until after the Thanksgiving holiday to inform Dumas that his employment was being terminated. PSOF ¶ 231. Povinelli emailed Joseph on November 21, 2022 to ask whether she could participate in the termination call, as she would be "**happy** to remind [Dumas] of his shortcomings[.]" PSOF ¶ 232 (emphasis added). Consistent with his refusal to hold discussions with Dumas about his progress against the PIP, Joseph told Povinelli: "I don't expect to engage in any back and forth discussion." PSOF ¶ 233.

On November 28, 2022, Dumas attended a call with Joseph and Lewis. Dumas was prepared to address items raised in the PIP as he believed that was the intention of the meeting. PSOF ¶ 234. Instead, Joseph and Lewis informed Dumas that his employment with Kroll was being terminated effective December 9, 2022. JSOF ¶ 111. Joseph and Lewis did not permit Dumas any opportunity to address issues raised in the PIP. PSOF ¶ 235. Lewis emailed Dumas a proposed severance agreement during the termination meeting. JSOF ¶ 112.

Dumas brings three claims in this action: (1) disability discrimination in violation of the New York State Human Rights Law ("NYSHRL"); (2) disability discrimination in violation of the New York City Human Rights Law ("NYSCHRL"); and (3) retaliation in violation of the NYCHRL.

## LEGAL STANDARDS

### A. Summary Judgment Standard

Summary judgment is only appropriate if "there is no genuine issue as to any material fact and [] the moving party is entitled to a judgment as a matter of law." *Gallo v. Prudential Res. Servs., Ltd. P'ship.*, 22 F.3d 1219, 1223 (2d Cir. 1994) (quotations omitted). "[T]he burden is upon the moving party to demonstrate that no genuine issue respecting any material fact exists." *Id.* at 1223 (citation omitted). Courts are "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Fasanello v. UN Int'l Sch.*, No. 19 Civ. 5281 (GHW), 2022 U.S. Dist. LEXIS 52536, at *30 (S.D.N.Y. Mar. 23, 2022) (citation omitted).

"[W]hen deciding whether th[e] drastic provisional remedy [of summary judgment] should be granted in a discrimination case, additional considerations should be taken into account. *Gallo*, 22 F.3d at 1224. "A trial court must be cautious about granting summary judgment to an employer when, as here, its intent is at issue." *Id.*

(citations omitted). The "task at the summary judgment motion stage [] is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them." *Id.* "Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005). Because "direct evidence of intentional discrimination is rare, 'affidavits and depositions must be carefully scrutinized for circumstantial proof' of discrimination." *Fasanello*, 2022 U.S. Dist. LEXIS 52536 at *30 (quoting *Turner v. NYU Hosps. Ctr.*, 784 F. Supp. 2d 266, 275 (S.D.N.Y. Mar. 4, 2011)).

**B. NYSHRL and NYCHRL Standards**

While employment discrimination claims under the NYSHRL were historically analyzed identically to claims under Title VII, "[t]he New York State Legislature passed several amendments to the NYSHRL in June 2019, the effect of which is to render the standard for claims closer to the standard of the NYCHRL." *Desiderio v. Hudson Techs., Inc.*, No. 22 Civ. 541, 2025 U.S. Dist. LEXIS 84285, at *25 (S.D.N.Y. May 2, 2025) (quoting *Livingston v. City of New York*, 563 F. Supp. 3d 201, 232 n.14 (S.D.N.Y. Sep. 28, 2021); *see also Nofal v. IMCMV Times Square LLC*, 22 Civ. 3104 (DEH), 2024 U.S. Dist. LEXIS 47603, at *10-11 (S.D.N.Y. Mar. 15, 2024) ("Because Plaintiff's NYSHRL claims accrued after the most recent amendments, they 'rise and fall with [his] NYCHRL claims.'") (quoting *Syeed v. Bloomberg L.P.*, 568 F. Supp. 3d 314, 345 (S.D.N.Y. Oct. 25, 2021) ("[T]he amended NYSHRL adopts the same standard as the NYCHRL.")); *Gerard v. 1199 Nat'l Ben. Funds*, No. 23 Civ. 7950 (DEH), 2024 U.S. Dist. LEXIS 166600, at *9 (S.D.N.Y. Sep. 13, 2024) (same).

Under the summary judgment standard now applicable to both NYSHRL and NYCHRL claims:

> [T]he plaintiff must establish a prima facie case, and the defendant then has the opportunity to offer legitimate reasons for its actions. If the defendant satisfies that burden, **summary judgment is appropriate if no reasonable jury could conclude either that the defendant's "reasons were pretextual," or that the defendant's stated reasons were not its *sole basis* for taking action, and that its conduct was based at least "in part on discrimination."** In other words, **summary judgment is appropriate if "the record establishes as a matter of law" that discrimination or retaliation "play[ed] *no role*" in the defendant's actions.**

*Ya-Chen Chen v. City Univ. of N.Y.*, 805 F.3d 59, 75-76 (2d Cir. 2015) (emphasis added) (quotations omitted); *see also Dearden v. Glaxosmithkline LLC*, No. 15 Civ. 7628, 2017 U.S. Dist. LEXIS 149408, at *35 (S.D.N.Y. Sep. 14, 2017) ("To obtain summary judgment on a NYCHRL claim, a defendant must show that 'no jury could find defendant liable under any of the evidentiary routes: under the *McDonnell Douglas* test, or as one of a number of mixed motives, by direct or circumstantial evidence.'") (quoting *Gioia v. Forbes Media LLC*, 501 F. App'x 52, 56 (2d Cir. 2012); *Jones-Cruz v. Brookdale Hosp. Med. Ctr.*, No. 19 Civ. 6910 (MMG), 2025 U.S. Dist. LEXIS 108024, at *21 (S.D.N.Y. June 6, 2025) ("Under the NYCHRL . . . [t]he employer is entitled to summary judgment on the basis of a legitimate, non-discriminatory motive only if the record establishes as a matter of law that discrimination played *no* role." (quotations omitted)).

## ARGUMENT

To establish a *prima facie* disability discrimination claim under the NYSHRL and NYCHRL, Dumas must point to evidence that he was "treated 'less well' [] because of a discriminatory intent." *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 110 (2d Cir. 2013) (quoting *Williams v. N.Y.C. Hous. Auth.*, 872 N.Y.S.2d 27, 39 (1st Dep't 2009)); *see also Heiden v. N.Y.C. Health & Hosps. Corp.*, No. 20 Civ. 10288 (LJL), 2023 U.S. Dist. LEXIS 5583, at *101 (S.D.N.Y. Jan. 11, 2023) ("A plaintiff may 'prevail in an action under the NYCHRL if he [] proves that unlawful discrimination was one of the motivating

factors, even if it was not the sole motivating factor, for an adverse employment decision.'") (quoting *Melman v. Montefiore Med. Ctr.*, 946 N.Y.S.2d 27, 40 (1st Dep't 2012)); *Hamburg v. N.Y. Univ. Sch. of Med.*, 62 N.Y.S.3d 26, 32 (1st Dep't 2017).

To make out a *prima facie* retaliation claim under the NYCHRL, Dumas "must show that: (1) he engaged in a protected activity; (2) the employer was aware of this activity; (3) the employer took adverse employment action against [him]; and (4) a causal connection exists between the adverse action and the protected activity. *Pacheco v. Park S. Hotel, LLC*, No. 12 Civ. 9127, 2014 U.S. Dist. LEXIS 9690, at *7-8 (S.D.N.Y. Jan. 27, 2014) (citations omitted). With respect to the "adverse action" element, the NYCHRL requires Dumas only "to show that something happened that was reasonably likely to deter a person from engaging in protected activity." *Xiang v. Eagle Enters., LLC*, No. 19 Civ. 1752 (PAE), 2020 U.S. Dist. LEXIS 7909, at *26 (S.D.N.Y. Jan. 16, 2020). Requests for accommodation constitute protected activity under the NYCHRL. *Id.* at *27 (quotation omitted). Again, "summary judgment is appropriate only if [he] cannot show that retaliation played any part in the employer's decision." *Heiden*, 2023 U.S. Dist. LEXIS 5583, at *101 (quoting *Mihalik*, 715 F.3d at 116) (internal quotation marks omitted).

There is no dispute that Dumas was disabled as a result of his medical condition, that he engaged in protected activity by requesting accommodations, or that he suffered adverse employment actions when he was denied his second accommodation request and the secondment to Assured and, thereafter, when his employment was terminated by Kroll. The sole disputed issue is whether discriminatory and retaliatory animus played *any* role in Kroll's termination decision.

**A. The Substantial Record Evidence of Discriminatory and Retaliatory Animus**

Kroll's animus towards Dumas as a result of his disability and remote work accommodation permeates the record and is reflected most blatantly in the events

surrounding Kroll's attempt to assign Dumas on-site work in violation of his medical accommodation. While Kroll granted Dumas's initial remote work accommodation *on paper*, it soon requested that he perform on-site work, rejected his second accommodation request to perform that work, and terminated his employment promptly thereafter.

**1. Kroll's Actions to Terminate Dumas's Employment Begin Immediately After Its Attempts to Assign Dumas to On-Site Work in Violation of his Medical Accommodation**

There is zero dispute that Povinelli attempted to assign Dumas to an on-site secondment with Assured in September 2022 **even though she was aware at the time of Dumas's medical accommodation to work remotely**. JSOF ¶ 86. In fact, callously ignoring his accommodation, Povinelli characterized the on-site secondment as an opportunity for Dumas "to prove himself, or not" and represented to Assured on September 20, 2022 that Dumas would be available to work on-site three times per week. JSOF ¶ 85, 89. Joseph condoned Povinelli's discriminatory behavior. Aware of Dumas's medical remote work accommodation, neither Joseph nor anyone else at Kroll instructed Povinelli to refrain from her attempts to pressure Dumas to perform on the on-site secondment due to his accommodation. JSOF ¶ 87. To the contrary, when Dumas later attended an in-person meeting with Melis, at her request, Joseph pejoratively remarked to Melis: "**Dennis has been a bust. I'm surprised that he is actually coming in, because he presented HR with a doctors [*sic*] note stating that he is too week [*sic*] to come to the office for the next year.**" PSOF ¶ 202 (emphasis added).

When Dumas informed Povinelli on September 20, 2022 that he could not perform the on-site secondment absent an accommodation, Povinelli exploded. Angrily, she questioned Dumas's need for the initial remote work accommodation. PSOF ¶ 192-93. Without engaging in the interactive process required in Kroll's own handbook, she summarily rejected Dumas's request for an accommodation in the form of a car service,

which would have enabled him to perform the secondment. *See* PSOF ¶ 192-97; JSOF ¶ 92; JSOF ¶ 8. And she angrily told Dumas to "forget it" or "forget leading the Assured project" after his request for an accommodation. JSOF ¶ 92. As Dumas testified:

> **[W]hen she asked me to go on-site for a client five days a week, I told her, "I have a medical accommodation and five days a week wouldn't work out. How about two days a week and maybe arranging for car service for two days a week?" That I work remotely three days a week. And she argued with me. She was angry. She argued with me and she said, you know, Dennis, everybody loses productivity at a time when they commute in to work. That's not a reason for you to—you know, to *only work two days*." So she was arguing with my medical accommodation.** She told me that she had given my bio to Assured and Assured liked my bio and wanted to use me as their temporary chief compliance officer. And she said they wanted me on-site five days a week. So I raised the disability with her, and the fact that I'm supposed to be working off site. And how about—**I'm trying to have a dialogue and work things out. And I say, "What about two days a week and arrange for car service?"** It was supposed to be a very profitable engagement. $60,000 a month. I mean, there's enough in there to justify car service. And **what ended up happening was she—after arguing with me—I'm trying to have a dialogue with her about how to productively solve this. And I call her up the next day, "What's happening with Assured?" And she says, "just forget it." Angry. She's angry. "Just forget it."** She hangs up.

Dumas Dep. I 194:18-196:6 (emphases added).

The next day, Povinelli informed Joseph that another employee would "take one for the team" by going on-site two days per week for the Assured project.[2] JSOF ¶ 94. Povinelli further informed Joseph that she would speak with Lewis to "put forth a plan" for Dumas. JSOF ¶ 96. Just one week later, on September 27, 2022, Povinelli provided Joseph and Lewis with a draft PIP for Dumas. PSOF ¶ 198.

---

[2] Defendant's claim that Dumas's request for an accommodation to work on-site two days per week did not align with Assured's needs is controverted by this email confirming that Lance provided an on-site presence for Assured two days per week, precisely what Dumas suggested in his accommodation request. *See* JSOF ¶ 94-95.

These events present a clear jury question as to the discriminatory and retaliatory motive behind Kroll's decision to terminate Dumas's employment. Only *one day* after attempting to assign Dumas to on-site work to "prove himself" in contravention of his accommodation, arguing with Dumas about his need for his initial accommodation, and rejecting his secondment-related accommodation request, Povinelli informed Joseph that she would work with Lewis to "put forth a plan" for Dumas. She provided Lewis with a draft PIP for Dumas just one week later.[3] The PIP was issued to Dumas on October 25, 2022, within five weeks of Kroll's attempt to assign him to on-site work with Assured. JSOF ¶ 103. On November 17, 2022, Kroll decided to terminate Dumas's employment less than a month after the PIP and less than two months after it attempted to assign Dumas on-site work and rejected his alternative accommodation request. DSOF ¶ 129. The temporal proximity of these events along with Povinelli's clear animus raises inferences of discriminatory and retaliatory intent and requires denial of Defendant's motion. *See, e.g., Ruiz v. Credit Agricole Corp. & Inv. Bank*, No. 22 Civ. 10777 (VSB) (BCM), 2025 U.S. Dist. LEXIS 109626, at *25 (S.D.N.Y. June 10, 2025) ("[T]wo-months' temporal proximity between Ruiz's complaint and the adverse actions is sufficient temporal proximity to raise a causal inference of discrimination." (citing *Specht v. City of New York*, 15 F.4th 594, 605 (2d Cir. 2021) (five months between protected conduct was "sufficient to permit an inference of causation")); *Pacheco*, 2014 U.S. Dist. LEXIS 9690, at *10 ("To be close in time, the adverse activity must generally have occurred within two months of the protected activity.") (citation omitted).

[3] To the extent there is any question that the "plan" Povinelli referred to in her email was the PIP, that inference must be drawn in Dumas's favor. Povinelli claimed not to recall whether she was referring to the PIP in this correspondence but confirmed that there was not "any other sort of plan involving Dumas in writing . . . other than his performance improvement plan." Povinelli Dep. 149:9-13.

### 2. Kroll's Failure to Engage in Cooperative Dialogue in Response to Dumas's Alternative Accommodation Request

Kroll argues that it cannot be liable for discrimination or retaliation because it granted Dumas's remote work accommodation, ignoring Povinelli's misconduct. An employer cannot avoid liability by granting an accommodation on paper and then pressuring an employee to perform work in violation of the accommodation's terms and retaliating against him for refusing to comply. Defendant's claim that "[n]o one discouraged Plaintiff from working remotely" after his medical accommodation was granted, Mtn. at 6, is simply false, as the facts set forth in Section I(A)(1) above confirm.

Kroll also ignores its decision to summarily reject Dumas's second request for an accommodation. Dumas requested to work on-site two days per week with car service to perform the Assured secondment, in response to Kroll's pressure to perform on-site work. This is both evidence of discriminatory motive supporting Dumas's NYSHRL and NYCHRL claims *and* gives rise to independent liability under the NYCHRL.[4]

There is no dispute that Kroll rejected Dumas's alternative accommodation request without engaging in any interactive process or cooperative dialogue with him

[4] Kroll's contention that Dumas has not raised a failure to accommodate claim is both factually wrong and legally flawed. *See, e.g.,* Complaint (ECF No. 1) at ¶ 57 **("[O]n or about September 20, 2022, Povinelli called Dumas to ask him to work onsite for a client who needed a temporary Chief Compliance Officer. Dumas informed Povinelli that based on his medical condition he would not be able to work on-site full-time, but proposed alternative solutions including an on-site presence one or two days a week and a car service to assist him with travel to and from on-site work. Povinelli challenged Dumas' documented need for a remote work accommodation, and the next day angrily told Dumas to 'forget it.'")**; *id.* at ¶¶ 93, 100 (alleging that "Defendant discriminated against Dumas in violation of the [NYSHRL and NYCHRL] by, *inter alia*, discharging Dumas from employment with Defendant because of his disability"). These pleadings put Kroll on notice regarding Dumas's claims, and there is no requirement that failure to accommodate or engage in cooperative dialogue be pleaded as a distinct claim from a "discrimination" in a complaint. *See, e.g., Heiden*, 2023 U.S. Dist. LEXIS 5583, at *104 (observing that "[d]iscrimination includes failing to provide a reasonable accommodation for a disability" and denying defendant's summary judgment motion on plaintiff's "cooperative dialogue" claim even though "cooperative dialogue" was not pleaded as separate claim in the complaint); *see also Heiden*, No. 20 Civ. 10288 (LJL) at ECF No. 1 (Complaint) (Baynes Decl. Ex. 19).

whatsoever. Povinelli informed Assured that Dumas would be available to work on-site three days per week in a September 20, 2022 email at 9:30 p.m. JSOF ¶ 89. On September 21, 2022 at 10:43 a.m., less than twelve hours after this email and her call with Dumas, Povinelli emailed Joseph to state that Lance would instead perform the Assured secondment. JSOF ¶ 94. The same day, Povinelli also told Dumas to "forget it" when he followed up with her on about his request for an accommodation to work the secondment. JSOF ¶ 92. Povinelli did not discuss Dumas's accommodation request with Lewis prior to telling Dumas to forget about the project. PSOF ¶ 195. Nor did Joseph discuss the accommodation with Povinelli, instead telling his supervisor days later that Dumas had "been a bust" and had "presented HR with a doctors [*sic*] note" that he was "too week [*sic*] to come into the office[.]" PSOF ¶ 196, 202. Kroll did not issue a written determination on Dumas's accommodation request. PSOF ¶ 197.

Kroll's failure to engage in a cooperative dialogue violated the law and its own Equal Employment Opportunities Policy, which states in pertinent part:

> [T]he Company will engage in good faith in a dialogue (written or oral) concerning an employee's accommodation needs and potential accommodations for those needs. **The Company will engage in this cooperative dialogue within a reasonable time after an employee requests an accommodation or the Company becomes aware of the possible need for an accommodation**. At the conclusion of the dialogue, **the Company will provide the participating employee with a written final determination identifying any accommodation granted or denied**.

JSOF ¶ 8 (emphasis added).

Courts have repeatedly observed that an employer's failure to engage in an interactive process and cooperative dialogue following an accommodation request is itself evidence of discrimination. *See, e.g., Wellner v. Montefiore Med. Ctr.*, 2019 U.S. Dist. LEXIS 147844, at *34 (S.D.N.Y. Aug. 29, 2019) ("[A] court can consider a defendant's

failure to engage in an interactive process as evidence that the defendant engaged in discrimination or retaliation."); *Fasanello*, 2022 U.S. Dist. LEXIS 52536, at *55-56 (S.D.N.Y. Mar. 23, 2022) ("[A] reasonable jury could conclude that the interactive process was not handled in good faith and that this could contribute to a finding of discrimination."); *Jacobsen v. N.Y.C. Health & Hosps. Corp.*, 22 N.Y.3d 824, 838 n.2 (2014) ("[F]ailure to hold a constructive dialogue about the possibility of a reasonable accommodation may indicate that the employer has discriminated 'because of' an individual's disability within the meaning of . . . the [NYCHRL]").

In addition to evidencing discriminatory animus under both the NYSHRL and NYCHRL, Kroll's failure to engage in any cooperative dialogue "is independently actionable under the NYCHRL." *Heiden*, 2023 U.S. Dist. LEXIS 5583, at *109 (quoting *Goldman v. Sol Goldman Invs. LLC*, No. 20 Civ. 6727 (MKV) (SN), 2022 U.S. Dist. LEXIS 140927, at *13 (S.D.N.Y. Aug. 5, 2022)); *see also Goldman*, 2022 U.S. Dist. LEXIS 140927 at *28, 31-32 (holding that failure to engage in cooperative dialogue "is a *per se* violation of the NYCHRL and is independently actionable" and granting the *plaintiff's* motion for summary judgment); *Stuart v. T-Mobile USA, Inc.*, No. 14 Civ. 4252, 2015 U.S. Dist. LEXIS 106155, at *27 (S.D.N.Y. Aug. 12, 2015) ("[T]he failure to engage in an interactive process is itself a violation of the law and gives rise to an independent claim.") (collecting cases).

The undisputed record establishes that Kroll failed to engage in a cooperative dialogue with Dumas about his request for an accommodation to perform the on-site Assured secondment two days per week with a car service. This evidences Kroll's discriminatory misconduct, and it requires denial of its summary judgment motion on Dumas's NYCHRL claim. *See Heiden*, 2023 U.S. Dist. LEXIS 5583, at *109-11.

### 3. Kroll Terminates Dumas's Employment Seventeen Business Day After Issuing the PIP

Per Povinelli's own testimony, the purpose of a PIP is to point out performance deficiencies and provide an employee with an opportunity to improve upon them. PSOF ¶ 205. There is no dispute that Joseph advised Dumas in the PIP: "I will meet with you weekly to discuss your progress and to provide any assistance you may need as you work through this PIP." JSOF ¶ 105. Nevertheless, Joseph did not hold a single meeting with Dumas to discuss his progress against the PIP in the mere seventeen business days before Kroll decided to terminate his employment. JSOF ¶ 106.

Strikingly, Joseph refused to meet with Dumas even after confirming with Lewis that he had informed Dumas that the meetings for PIP feedback would occur and receiving instruction from Lewis to hold the weekly meetings. PSOF ¶¶ 215-16; DSOF ¶ 88. Anticipating the meetings per the PIP, Dumas recorded notes about his efforts to address the purported performance issues raised in the PIP with Joseph and about unfair criticisms of his work by Povinelli. PSOF ¶ 213. But Joseph never scheduled a meeting with Dumas to provide any opportunity to address the PIP items prior to the termination decision. JSOF ¶ 106.

Kroll contends that Joseph's failure to hold a single follow-up meeting with Dumas should not be considered as evidence that Kroll treated Dumas less well than non-disabled employees. This argument ignores record facts. Specifically, Povinelli testified that she was involved in issuing PIPs to Kroll employees [redacted] and [redacted]. With respect to post-PIP follow-up meetings for these employees,[5] Povinelli testified:

[5] Kroll meagerly argues that these employees are not proper comparators. It is undisputed that Kroll's Corrective Action policy, which establishes the PIP procedure that Dumas and these employees were subject to, "applies to all Company employees." PSOF ¶ 236. Moreover, the same categories and factors are used to evaluate the performance of both Directors and Vice Presidents. PSOF ¶¶ 237-38.

> Q. So with respect to [redacted], whom you remember, after issuing you[r] PIP to [redacted], **did you have follow-up meetings with him about his progress against the deficiencies that were noted in his PIP**?
>
> A. I don't recall. **I assume I did**.
>
> Q. And **you assume you did because it was standard if a PIP was issued to have those sort of follow-up meetings if you were a supervisor**?
>
> A. **Correct**.

Povinelli Dep. 185:23-186:11 (emphasis added). Povinelli similarly testified that she "believe[d] she did" when questioned as to whether she held follow-up meetings to discuss progress with [redacted] following his PIP issuance. *Id.* 188:16-22.[6]

Kroll also puzzlingly contends that non-disabled employees were provided with similar time periods to address PIP deficiencies despite evidence to the contrary. One comparator was not terminated until 98 days after PIP issuance. JSOF ¶¶ 120-121. A second resigned 72 days after PIP issuance. JSOF ¶ 119. A third was terminated 72 days after PIP issuance. JSOF ¶ 123. A fourth was terminated 59 days after PIP issuance. JSOF ¶ 122. In contrast, Kroll made the decision to fire Dumas just 23 calendar days (seventeen business days) after the PIP was issued, with an effective termination date just 44 days after its issuance. DSOF ¶ 128; JSOF ¶ 4. Both the atypical absence of post-PIP follow-up meetings and the truncated period that Kroll afforded Dumas to address PIP issues are reflective of discriminatory motive and raise triable issues of fact as to whether Kroll treated Dumas less well than similarly situated non-disabled employees.

---

[6] Kroll's representation that *Joseph* never met with any of the comparators is simple sleight-of-hand: Joseph did not issue any of the PIPs. PSOF ¶ 239.

Further, while declining to schedule any post-PIP meetings with Dumas, Joseph relied on Povinelli's feedback in making the termination decision. DSOF ¶ 128.[7] Evidence of Povinelli's animus abounds. She commented on Dumas's "health issues" and "time on [his] hands" after his remote work accommodation. PSOF ¶ 185. She attempted to assign him on-site work in violation of the accommodation as an opportunity "prove himself," angrily questioned his need for an accommodation and rejected his alternative accommodation request, and told Joseph she would "put forth a plan" for Dumas the next day. JSOF ¶¶ 85, 86, 92, 94; PSOF ¶¶ 191-94. Joseph was fully aware of but took no action to prevent Povinelli from assigning on-site work because of Dumas's medical accommodation and informed his supervisor that Dumas was "a bust" and had presented HR a doctor's note just days later. JSOF ¶ 87; PSOF ¶ 202. When Joseph stated that he was ready to terminate Dumas's employment on November 17, 2022, Povinelli encouraged him to do so and falsely claimed that she had not heard from Dumas "in a few days" despite correspondence between them only days before. PSOF ¶ 228-30.[8] Povinelli's direct involvement in the termination decision further reinforces Kroll's liability. *See, e.g.*, *Fasanello*, 2022 U.S. Dist. LEXIS 52536 at *44 (reciting "cat's paw" liability where a supervisor is "motived by a discriminatory or retaliatory animus and was involved in the termination decision").

**B. Kroll's Purported Justifications Do Not Warrant Summary Judgment**

The evidence of discriminatory and retaliatory animus recited above precludes Kroll's summary judgment motion regardless of its purported non-discriminatory

[7] In fact, Joseph relied almost exclusively on Povinelli's input. He did not receive feedback from Valouktzis until November 22, 2022, five days *after* the termination decision. DSOF ¶¶ 122; 128

[8] One issue over which there is no dispute is Povinelli's scant credibility. Kroll has filed a federal lawsuit against her theft of trade secrets and breach of fiduciary duties. PSOF ¶ 240.

justifications. *See, e.g.*, *Heiden*, 2023 U.S. Dist. LEXIS 5583 at *101("a plaintiff can forestall summary judgment on a NYCHRL claim by proffering evidence to raise an issue of fact that the action was motivated **at least in part** by discrimination" (emphasis added)); *id.* at *103 (denying summary judgment where plaintiff "put forward enough evidence for a jury to find that **even if the accommodation request was not the but-for cause of the request to Plaintiff to resign, it played a part—albeit perhaps minor—in the decision to ask for the resignation**") (quotations omitted) (emphasis added); *Fasanello*, 2022 U.S. Dist. LEXIS 52536 at *50 (S.D.N.Y. Mar. 23, 2022) ("The Court **cannot conclude on the facts presented that discrimination played *no part* in [the defendant's] termination decision.**") (emphasis added). There is also evidence to support a jury finding that Kroll's justifications are pretextual.

The contemporaneous documentation in this case reflects that Kroll did not raise any criticisms of Dumas's work until after his disability, and then increasingly did so after his remote work accommodation. Dumas's 2021 performance ratings were undisputedly positive. JSOF ¶ 50; PSOF ¶ 166.[9] Contrary to Joseph's *post hoc* characterizations of Dumas's work on expert reports prior to his medical leave, Joseph's emails to Dumas reflect positive feedback. PSOF ¶¶ 164-65. It was only *after* he returned from protected medical leave that Dumas began to receive critical reviews. *Macropoulos v. Metro. Life Ins. Co.*, 2018 U.S. Dist. LEXIS 49626 at *32 (S.D.N.Y. Mar. 26, 2018) ("Positive performance reviews prior to termination can demonstrate pretext.") (citations omitted).

As of the August 8, 2022 mid-year review issued three weeks after Dumas's initial accommodation request, Joseph recalled only two pre-disability matters as assignments

[9] Kroll's attempt to claim that the 2021 evaluation was a "placeholder" is irrelevant as the evidence must be read on its own terms and, in this motion, interpreted in the light most favorable to Dumas. It is also the type of characterization that should be "carefully scrutinized" in an employment discrimination case. *Fasanello*, 2022 U.S. Dist. LEXIS 52536 at *30.

on which Joseph made personal observations about Dumas's work, although Dumas had returned to work on April 18, 2022. PSOF ¶ 173, 187. This reticence by Joseph to assign Dumas work after his medical leave is itself suggestive of discriminatory animus. It is even more relevant given Kroll's reliance on criticisms of Dumas's "utilization" and client engagement numbers following his disability. While Joseph repeatedly referred to Dumas's limited client engagements during his deposition, **it is undisputed that Dumas could not assign himself work**. PSOF ¶ 175. Those assignments were primarily made by Povinelli, who held animus against Dumas. PSOF ¶ 174; DSOF ¶ 107.

Dumas's utilization numbers were impacted by Povinelli's assignment of work on projects with limited billable hour availability. For example, the Lakemore budget that Povinelli was responsible for was $3,000 per month. PSOF ¶ 223; DSOF ¶ 153. Povinelli's billable hourly rate was $900 and Dumas's was $500. PSOF ¶ 224. Thus, even had no other employee billed time to Lakemore, Dumas's available billable hours on the project would have been capped at six per month. In fact, Povinelli instructed Dumas to back out billable time on Lakemore—as she did on other projects[10]—because "Lakemore doesn't pay that much." PSOF ¶ 225. Similarly, Dumas requested additional work because of the lack of available billable hours on TCU. PSOF ¶ 179. Given Kroll's focus on Dumas's utilization rates as justification for his termination, its post-disability assignment of limited clients to Dumas[11] on projects with limited billable hour availability raises a jury question on pretext.

[10] Dumas was required to back out 174.25 for hours billed to Kroll clients during 2022. DSOF ¶ 99. Kroll's argument that this does not alter the pretext analysis is a non-starter. A jury could undoubtedly consider this as evidence, along with his limited assignments, that Kroll's later critiques of his utilization rate are pretextual.

[11] Dumas was only assigned responsibility for two clients by Kroll as of his mid-year review. DSOF ¶ 51.

As to business generation, Joseph did not discuss revenue goals with Dumas directly before his PIP was issued. PSOF ¶ 207. Dumas's job description did not list revenue targets and they were not discussed in his interview. JSOF ¶ 28; PSOF ¶ 162. The October 25, 2022 PIP further instructed Dumas to "demonstrate efforts to achieve" the targets "through the end of the calendar year." PSOF ¶ 211. Dumas reported taking the very steps that were required in his PIP by reaching out to prospective clients and sharing efforts during Director calls. PSOF ¶¶ 210, 212; DSOF ¶ 97. Kroll still determined to fire him seventeen days after the PIP issuance.

Finally, Kroll's critiques of Dumas's limited expertise are belied by the record. Joseph did not raise contemporaneous pre-disability concerns with Dumas's work on expert reports. PSOF ¶ 164-66; JSOF ¶ 50. Povinelli further stated in September 2022 that she could not think of anyone other than Dumas with "the capacity and knowledge to be seconded" at Assured. PSOF ¶ 191. Kroll has failed even to establish that its central example of Dumas's purported lack of substantive knowledge—his claimed omission of a Dodd-Frank five-day complaint response window in Lakemore's whistleblower policy, *see* Mtn. at 14—is legitimate. Dumas contemporaneously challenged this criticism. PSOF ¶ 217. Povinelli, who is not an attorney, could not confirm the existence of any such Dodd-Frank regulation despite her berating of Dumas. PSOF ¶ 160, 218. Further, despite Povinelli's constant criticisms of Dumas on Lakemore, the Lakemore team Dumas worked with requested an additional engagement. PSOF ¶ 226. Dumas also continues to serve as an expert consultant following his termination by Kroll. PSOF ¶ 159.

Viewed in the light most favorable to Dumas, there is more than sufficient evidence that Kroll's termination justifications are pretextual and raise jury questions. In any event, Kroll's motion must still be denied because its decision to fire Dumas was motivated **at least in part** by discriminatory and retaliatory animus. Substantial evidence

proves that Kroll decided to fire Dumas immediately after attempting to assign Dumas on-site work, in violation of his medical accommodation, and rejecting his alternative accommodation request.

**CONCLUSION**

For all of the above reasons, Dumas respectfully requests that Defendant's motion for summary judgment be denied.

Dated: New York, New York
August 8, 2025

PECHMAN LAW GROUP PLLC

By: *[s] Galen C. Baynes*
Galen C. Baynes

**WORD COUNT CERTIFICATION**

Pursuant to Local Rule 7.1(c) of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York and this Court's Individual Rules and Practices, I hereby certify that the foregoing Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment complies with the word-count limitations. The foregoing Memorandum of Law contains 8,651 words, not including the caption, table of contents, table of authorities, signature blocks, and this certificate.

*/s/ Galen C. Baynes*
Galen C. Baynes